UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In Re:

      BRUCE B. NICHOLS,                  Chapter 12
      *d/b/a* GALILEE FARMS, LLC,        Case No.: 09-62530

                                *Debtor*.
_____

APPEARANCES:

TREVETT CRISTO SALZER & ANDOLINA P.C.    DAVID H. EALY, ESQ.
*Attorneys for Bruce B. Nichols, d/b/a*
*Galilee Farms, LLC*
Two State Street, Suite 1000
Rochester, New York 14614

GREEN & SEIFTER, PLLC             JAMES L. SONNEBORN, ESQ.
*Attorneys for CVM Partners 1, LLC*      ROBERT K. WEILER, ESQ.
One Lincoln Center, Suite 900
110 West Fayette Street
Syracuse, New York 13202

SAUNDERS KAHLER, L.L.P.[1]          MERRITT S. LOCKE, ESQ.
*Attorneys for First National Equipment*    Of Counsel
*Financing, Inc. and*
*NAEDA Financial, Ltd., L.P.*
185 Genesee Street
Suite 1400
Utica, New York 13501

MARK W. SWIMELAR, ESQ.          MAXSEN D. CHAMPION, ESQ.,
*Chapter 12 Standing Trustee*          Of Counsel
250 South Clinton Street
Suite 203
Syracuse, New York 13202

Honorable Diane Davis, United States Bankruptcy Judge

---

[1] As of the date of issuance of this Memorandum-Decision and Order, Saunders Kahler, L.L.P. is counsel of record for the noted secured creditors pursuant to a substitution of counsel executed and filed on August 17, 2010.  (ECF No. 134.)

## MEMORANDUM-DECISION AND ORDER

Bruce B. Nichols ("Debtor"), operating under the d/b/a Galilee Farms, LLC ("Galilee"),

filed an individual, bare bones voluntary petition for Chapter 12 relief on September 9, 2009.

(CVM Partners 1, LLC's ("CVM") Ex. 22, ECF No. 1.)  Presently under consideration by the

Court is a motion filed by CVM on March 23, 2010 (ECF No. 74), wherein CVM, as successor

in interest to HSBC Bank USA, N.A., formerly known as Marine Midland Bank ("HSBC"),[2]

seeks dismissal or, in the alternative, conversion of Debtor's Chapter 12 case to one under

Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (2006) ("Code"),

pursuant to Code § 1208(d).[3]  CVM's motion is supported by two of Debtor's secured creditors,

First National Equipment Financing, Inc. ("FNEF") and NAEDA Financial, Ltd., L.P.

("NAEDA").  FNEF and NAEDA filed a joint response in support of CVM's motion on April 7,

2010.[4]  (ECF No. 89.)

---

[2] As evidenced by a Bill of Sale executed on June 29, 2008, pursuant to an Asset Sale Agreement dated June 19, 2008, CVM acquired certain assets previously owned by HSBC, including HSBC's rights, title, and interests in, to, and under certain loans given by HSBC to Debtor in order to finance Debtor's farming operation.  (CVM's Ex. 20.)

[3] CVM has since amended its request for relief to one for conversion only, as stated on the record by James L. Sonneborn, Esq., in his opening statement made during the evidentiary hearing conducted in this matter on April 27, 2010, and repeated in CVM's Post-Trial Memorandum of Law in Support of Motion to Dismiss or Convert Chapter 12 Case filed on May 25, 2010 (ECF No. 107).

[4] CVM's motion is but one of several hurdles Debtor must overcome if he is to successfully emerge from Chapter 12.  Because some background information regarding the parties involved in this matter is useful in order to give context to this decision, the Court provides the following procedural history.  Debtor filed his Chapter 12 Plan ("Plan") on December 22, 2009.  (ECF No. 45.)  The confirmation hearing in this case was scheduled for January 20, 2010.  (ECF No. 50.)  Secured creditor CNH Capital America, LLC ("CNH"), filed an objection to confirmation on December 22, 2009.  (ECF No. 48.)  FNEF filed an objection to confirmation on January 7, 2010.  (ECF No. 52.)    NAEDA filed an objection to confirmation on January 7, 2010.  (ECF No. 53.)  The Chapter 12 Trustee, Mark W. Swimelar, Esq., filed an objection to confirmation on January 8, 2010.  (ECF No. 54.)  CVM filed an objection to confirmation on January 13, 2010.  (ECF No. 56.)  Secured creditor NBT Bank, National Association ("NBT") filed an objection to confirmation on January 13, 2010.  (ECF No. 57.)  On January 20, 2010, the parties appeared

The Court conducted an evidentiary hearing in this matter on April 27, 2010, and following the submission of post-trial memoranda of law by Debtor and CVM, the matter was taken under advisement on May 25, 2010.  Based on the record developed before the Court, which includes the testimony elicited from Debtor and Amy Moulton, CPA, Debtor's accountant for the past eight to ten years, the following constitute the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(a), 157(a), (b)(1), and (2)(A).

## FACTS

In the early 1960s, Debtor earned an agricultural associate's degree from Cornell University.  (Evidentiary Hr'g Tr. 21, Apr. 27, 2010, ECF No. 103.)  His undergraduate course work was in animal husbandry, and he has never taken any business or accounting courses. (Hr'g Tr. 74.)  In 1967, Debtor purchased the family dairy farm located in Ogdensburg, New York from his father, which farm is now known as Galilee.  The farm has been owned and operated by Debtors' ancestors for nearly two hundred years.  (Hr'g Tr. 79.)  Since assuming ownership of the farm, Debtor has continued his education through extension services and local community service projects, and has participated on educational boards and various advisory

---

before the Court and requested an expedited scheduling order setting an evidentiary hearing for the contested confirmation hearing.  The Court issued a Scheduling Order to that effect on February 11, 2010.  (ECF No. 63.)  Following multiple status conferences, a substitution of counsel by CVM, and the filing of CVM's instant motion, the Court advised the parties by letter dated April 12, 2010 ("April 2010 Letter Directive," ECF No. 93), that the confirmation hearing would be adjourned indefinitely pending the Court's adjudication of CVM's motion.  As part of its April 2010 Letter Directive, the Court further directed the parties to exchange and file with the Court their respective lists of witnesses and exhibits, as well as to submit their marked exhibits to Chambers no later than 4 p.m. on April 23, 2010.

committees in his community.  (Hr'g Tr. 21.)  Notably, Debtor has served as President and Vice President of the local County Farm Bureau, as an officer of the County Extension Service, and as an advisor to the local 4-H community club.  (Hr'g Tr. 22–24.)  Debtor is, therefore, both educated and competent to run the family farming business.  Debtor and his non-filing spouse, Mary L. Nichols, together with their three sons and one daughter, continuously operated the farm as a dairy farm for over forty years.

In 2009, a year that Debtor characterized as one of financial crisis for dairy farmers generally (Hr'g Tr. 88), Debtor sold the farm's herd of two hundred cows through the Cooperatives Working Together ("CWT") program, which is a non-government program developed by the National Milk Producers Federation aimed at strengthening and stabilizing the milk prices.[5]  (Hr'g Tr. 81–82.)  Debtor retained a small herd of less than a dozen cows.  At present, Galilee engages in both dairy and crop farming, with its primary focus on growing corn and soybeans for commercial sale.  (Hr'g Tr. 90.)

Debtor considers his son, Scot Nichols, to be a "full partner in both the decision-making process and in dividing up whatever profits [they] can make or revenue [generated] from the farm."  (Hr'g Tr. 90, 113.)  According to Debtor, the work of running the farm is divided between himself and Scot such that Debtor primarily handles the financial tasks and Scot handles the day-to-day labor-intensive tasks for Galilee.  For example, Debtor is solely responsible for preparing Galilee's financial statements, including the monthly profit and loss statements and the annual statement of net worth required for tax purposes, which he accomplishes using the computer software program known as QuickBooks.  (Hr'g Tr. 90–91, 97).  Debtor is also primarily responsible for the preparation of loan documents and preparation and execution of

---

[5] Information about CWT is available on their Web site at http://www.cwt.coop.

Galilee's tax returns.  Scot is responsible for machinery maintenance, planting and harvesting of crops, and taking care of the farm's remaining cattle herd.  (Hr'g Tr. 79, 89.)

At some point during 2002, Debtor began discussing with farm credit consultants the transfer of the farm and farming business to the next generation of his family.  (Hr'g Tr. 83.) Between 2002 and 2008, Debtor met with several professionals, including his corporate attorney, John K. Collins, Esq., and his accountant, Amy Moulton, CPA, who for the past ten years has been employed by Farm Credit East, formerly known as First Pioneer Farm Credit ("FCE") (Hr'g Tr. 123), as well as at least two other tax professionals employed by FCE (Hr'g Tr. 102). Debtor testified that he formed Galilee for succession purposes, in order to facilitate his retirement (Hr'g Tr. 71) and "to build a bridge between [his] son and [himself] to continue the operation of farming" (Hr'g Tr. 32, 84, 99, 109; Debtor's Ex. 1).  He stated that he has read too many articles describing family feuds between siblings over ownership of the family farm once a parent dies, and that to avoid tax and estate problems, numerous schools that he has attended have encouraged farmers to start the process of transferring the family farm to the next generation long before they reach retirement age or "it becomes mandatory."  (Hr'g Tr. 82.) Debtor recalled outlining plans to transfer the farming business to Scot "over a period of time, because . . . [he has] witnessed in [his] years too many times when farmers got old and a son sacrificed [his] whole life to work on that farm and [was] left out in the will."  (Hr'g Tr. 70.) Debtor also stated that because he did not understand the scope of the IRS and NYS legal or tax aspects associated with such transfer (Hr'g Tr. 70, 88), which led him to seek the advice and assistance of the professionals whom he placed "a lot of faith in."  (Hr'g Tr. 29-30, 34-35, 41.)

The Articles of Organization for Galilee were signed on October 12, 2007, by Attorney Collins.  (Hr'g Tr. 85.)  They were subsequently filed with the New York State Department of

State, Division of Corporations, on October 15, 2007.  (Debtor's Ex. 2.)   The Articles of

Organization, under the Ninth decretal paragraph, indicate that the original members and

managers of Galilee were Debtor and his son, Scot.  (*Id.*)

Debtor confirmed that, upon the formation of Galilee, he contemplated that both he and

Scot would hold membership interests in Galilee, but he didn't consider the allocation of their

respective membership shares or percentages prepared by his accountant to be relevant because

their intent was to continue farming.  (Hr'g Tr. 92.)  Debtor testified that at some point in time he

considered gifting Scot a 30% membership interest in Galilee.  (Hr'g Tr. 66.)  According to

Debtor, Scot earned a membership interest in Galilee through sweat equity because he worked

seven days a week, at hours necessary to make running a farm successful and for which he was

never adequately compensated, including during the past two years.  (Hr'g Tr. 111–12.)  He

testified that Scot's purported equity participation began sometime in 2008 and 2009.  (Hr'g Tr.

67.)  Debtor admitted, however, that as of April 27, 2010, he did not know whether Scot held a

"9.1%, 10%, or 35%" interest in Galilee.[6]  (Hr'g Tr. 68.)

Similarly, Debtor was unable to verify ever having legally transferred assets to Galilee.

(Hr'g Tr. 33, 67.)  Debtor also admitted that he did not recall giving Ms. Moulton a written

---

[6] Based upon the record before the Court, which does not include the operating agreement for
Galilee, the question of what percentage of ownership Scot actually holds in Galilee, or has held
since formation, remains unclear to this Court.  The Court upheld CVM's objection to Debtor's
proffer of Galilee's operating agreement for the reason that the same was not produced during
discovery or pre-marked and disclosed as a hearing exhibit as required by this Court's April
2010 Letter Directive.  While the operating agreement may have shed light on "the business of
[Galilee], . . . the conduct of its affairs and . . . the rights, powers, preferences, limitations or
responsibilities of its members," N.Y. LTD. LIAB. CO. LAW § 417(a) (Consol. 2010), as well as
the "obligations of any member to make contributions, . . . the allocation for tax purposes of any
items of income, gain, loss, deduction or credit, . . . [or] the manner of computing the
distributions of any member," *id.* § 417(b), its omission from the evidentiary record does not
materially affect the Court's adjudication of CVM's motion given the Court's complete findings
of fact as more fully set forth in the Discussion.

directive or power of attorney (Hr'g Tr. 33), or ever signing documents to effectuate a transfer of

assets from himself to Galilee (Hr'g Tr. 73).  Based upon the advice of his corporate attorney and

his accountant, however, it was his understanding that he had in fact taken the appropriate steps

to effectuate the transfer of assets that he owned in his individual capacity to Galilee on or about

January 1, 2008.  (Hr'g Tr. 33, 73.)  As of the hearing date, Debtor admitted that "[going]

through this bankruptcy" has given him a "better idea of what he did and did not own," but at all

times up until the point of the evidentiary hearing he believed that any transfer of assets to

Galilee would continue to carry with it both CVM's liens and the underlying indebtedness.

(Hr'g Tr. 73.)

Debtor's accountant, Ms. Moulton largely corroborated much of Debtor's testimony.  She

confirmed that she has been preparing Debtor's tax returns for nearly a decade, and that she had

also prepared Galilee's tax returns for the 2008 and 2009 tax years.  (Hr'g Tr. 124.)  She stated

that she advised Debtor regarding the formation of Galilee, which she and Debtor discussed at

least once a year beginning in 2002.  (Hr'g Tr. 125.)  As of December 2008, Ms. Moulton

believed that Debtor held an ownership interest in Galilee of 90.9%, while Scot held the

remaining 9.1% ownership interest.  (Hr'g Tr. 126.)  Ms. Moulton, however, testified that she

never prepared gift tax returns reflecting her understanding.  (Hr'g Tr. 131.)  Ms. Moulton

further testified that Debtor considered gifting a larger membership share or profits interest of

35% of Galilee to Scot (Hr'g Tr. 139–40), without requiring Scot to make a capital contribution

or giving him a capital ownership interest in Galilee because Scot had not been paid in the past in

spite of working on the farm for many years.

Ms. Moulton further testified that, to the best of her knowledge, Debtor never actually

legally effectuated a transfer or gift of an ownership interest in Galilee to Scot.  (Hr'g Tr. 133.)

Nevertheless, Ms. Moulton prepared Galilee's 2008 United States and New York State Partnership Returns to reflect on Schedules K-1[7] for Debtor and Scot beginning and ending profit, loss, and capital allocations individually of 50%, 50%, and 35%.[8]  (CVM's Ex. 11.)  Ms. Moulton conceded that although the 2008 tax returns erroneously stated the ownership interests of Debtor and Scot, she did not amend the 2008 tax returns because only the capital account ownership interests were incorrect and an amendment to correct the same "would not have been frugal," but that error was subsequently corrected in the 2009 tax return.  (Hr'g Tr. 144–45.)

With respect to whether Debtor transferred assets to Galilee, Ms. Moulton recalled that she had advised Debtor that the corporate formation of a New York agricultural limited liability company normally involves the transfer of cattle and equipment to the operating limited liability company.  (Hr'g Tr. 137.)  As Debtor's accountant, Ms. Moulton further advised Debtor that he had, in fact, transferred cattle and farming equipment to Galilee upon Galilee's formation.  (Hr'g Tr. 131.)

Debtor's banking relationship with CVM's predecessor, HSBC, significantly predates the formation of Galilee.  Between 1999 and 2008, pursuant to several notes and loan agreements, Debtor secured multiple loans from HSBC in the aggregate principal amount of $1,200,000.[9]  (CVM's Exs. 23–27.)  All notes and agreements were executed by Debtor or, in one instance, by Debtor and Scot, without reference to Galilee.  (*Id.*)  In connection with the loan agreements

---

[7] Schedule K-1 (Form 1065) is titled, "Partner's Share of Income, Deductions, Credits, etc.," and is issued by the Internal Revenue Service.

[8] Ms. Moulton testified that these percentages were clearly erroneous.

[9] Resolution of the parties' dispute regarding exactly what collateral is subject to CVM's security interests and liens will occur in due course in the context of a pending adversary proceeding commenced by CVM, in part, to determine whether certain proceeds of the sale or disposition of livestock constitute proceeds payable to CVM.  (CVM's Adversary Proceeding Compl., CVM's Ex. 34.)  CVM's causes of action pled therein are more fully set forth in the Discussion.  *See* Discussion pp. 13–14.

entered into, between 2006 and 2007, Debtor submitted to HSBC several farm financial statements documenting Debtor's net worth. (CVM's Exs. 15–19.)  Debtor acknowledged that two Farm Financial Statements, the first dated March 30, 2007 (CVM's Ex. 16), and the second undated (*id.*), both of which report Debtor's financial condition as of December 31, 2006, list an inconsistent net worth of $945,775 and $1,385,518, respectively.  Debtor could not immediately explain the discrepancy without further review and reflection, but he stated that he used estimated figures "to the best of [his] knowledge at that point in time, . . . without consulting [his] accountant."  (Hr'g Tr. 47.)  Debtor and Scot, in their individual capacities, also borrowed $110,000.00 from HSBC pursuant to an Installment Note dated April 8, 2008, for the purpose of planting crops.  (Hr'g Tr. 25, CVM's Ex. 9.)  In connection with this loan, Debtor, Scot, and Galilee submitted to HSBC a Farm Financial Statement documenting the parties' financial condition of all three parties as of December 31, 2008.  ("December 2008 FFS," CVM's Ex. 18.) Debtor testified that the December 2008 FFS listed the combined assets that he personally owned and, at the time, that he believed had been transferred to and were owned by Galilee.  (Hr'g Tr. 50.)  Debtor further testified that when he signed and submitted all documentation to HSBC or CVM, including the December 2008 FFS, he believed the representations made therein reflected his true financial condition and accurately reflected his assets and liabilities on the date of execution.  (Hr'g Tr. 26 & 47.)

As is customary, Debtor pledged certain farm assets, including dairy cattle, farm equipment, and supplies as collateral to secure payment of all loan obligations.    (*Id.*) Specifically, at least one security agreement granted HSBC an interest in all equipment, then owned or thereafter acquired by Debtor, including "all [e]quipment listed in any schedules as from time to time delivered by Debtor to [HSBC]."  (Jan. 26, 1999 Security Agreement (Farm

Products and Equipment), CVM's Ex. 4.)  On July 14, 2009, in response to a request made by

CVM's representative following Debtor's default on certain obligations owed to CVM, Debtor

provided CVM with a computer printout titled, "Bruce Nichols, Equipment, 5/3/2006" (CVM's

Ex. 21), which he testified represented the combined assets that he and Galilee owned as of that

date.  (Hr'g Tr. 50–52.)  He also acknowledged that the equipment list did not specifically

identify which equipment was owned by Debtor, Galilee, or both, and that he did not update the

list prior to sending it to CVM.  (Hr'g Tr. 53.)

By January 2009, Debtor's financial condition had significantly declined.  Debtor

described 2009 as a "devastating year" for the dairy farming industry.  (Hr'g Tr. 80.)  Debtor

testified that he was current with HSBC and subsequently with CVM through February or March

of 2009 (Hr'g Tr. 116–17), but that as early as February 26, 2008, he had fallen behind on

several obligations for crops, crop insurance, and for monies owed to an entity associated with

construction of a planned milking parlor that ultimately was never completed because of the

downturn in the family business (Hr'g Tr. 105–06, CVM's Ex. 17).

Due to his default on obligations owed to CVM under four loans on or around February

2009, and on obligations owed under a fifth loan on or about June 2009, CVM accelerated the

indebtedness and demanded payment in full of the entire accelerated unpaid remaining principal

balances, accrued interest, and accrued late charges on all of Debtor's five outstanding loans.

(CVM's Exs. 2, 6–9.)  Unable to reach a settlement with CVM, Debtor testified that he was

motivated in 2009 to surrender the dairy herd through the CWT herd retirement program because

he believed he could generate $200,000 to $300,000 from such sale, which he could then pool

with a prospective FSA loan in the amount of up to $300,000 in order to pay off CVM in full.

(Hr'g Tr. 81.)  Debtor retired the herd and agreed to cease milk production for the period of one year in exchange for payment from CWT, which proceeds are currently being held in escrow.

By the Fall of 2009, Debtor decided to seek bankruptcy protection.  Debtor filed his original schedules and Statement of Financial Affairs ("SOFA") on October 12, 2009.  (ECF No. 24, CVM's Ex. 29.)  On Schedule B, titled "Personal Property," under Paragraph 13, Debtor lists a 90.90% ownership interest in Galilee, which he states has "no net value."  Debtor also filed Galilee's balance sheet dated October 12, 2009, which lists, *inter alia*, total assets valued at $1,297,697 and total debt in the amount of $1,502,633.  The itemized list of assets includes livestock appraised at $102,050, machinery and equipment appraised at $554,550, growing crops valued at $207,500, stored crops valued at $5,000, a 90% interest in CWT Proceeds valued at $190,019, cattle sale proceeds having a net value of $92,240, milk equity valued at $71,338, and grain bins subject to a finance lease valued at $75,000.  The list of liabilities includes non-recourse debt owed to CVM in the amount of $572,559.  Debtor's Schedule I, titled "Current Income of Individual Debtor(s)," lists Debtor's occupation as a crop farmer, and states that he has been employed by Galilee for two years.  Debtor filed an Amended Schedule I on October 15, 2009.  (ECF No. 29.)  Amended Schedule I, under Paragraph 17, states that Debtor expects to receive additional income from membership distributions through farm operations commencing November 2009.

Debtor's SOFA, under Paragraph 1, reports additional historical income data, including capital gains from the sale of livestock in 2007 and 2008 totaling $26,970 and $90,580, respectively, gross farming income in 2007 and 2008 totaling $1,071,050 and $113,782, respectively, rental income in 2008 totaling $6,650, partnership income in 2008 totaling $35,956, and business draws of $1,000 per month in 2009.  Under Paragraph 10, Debtor lists transfers

made to Galilee on January 1, 2008, of livestock valued at $1,006,200, and machinery and equipment valued at $1,161,600, for "equivalent value in the form of 100% membership interest." Under Paragraph 14, Debtor lists certain items of personal property owned by Galilee for which Debtor holds title individually. Under Paragraph 19, Debtor indicates that he issued financial statements within two years immediately preceding the bankruptcy filing to CVM, NBT, USDA Farm Service Agency, and HSBC Bank USA. No further amendments have been made to Debtor's schedules or SOFA as of the date of issuance of this decision.

Debtor filed his Plan on December 8, 2009 (ECF No. 45, CVM's Ex. 35), which prompted multiple objections.[10] The Plan proposes to pay $11,000 per month for a term of sixty months, totaling $660,000, together with lump sum payments in December and April of each year in the amount of $38,500 each, for an additional total sum of $385,000. The Plan segregates claimants into eleven classes, including, but not limited to, the objecting creditors as follows: CVM as Class 1, NBT as Class 2, CNH as Classes 4 and 5, NAEDA as Class 7, FNEF as Class 8, and general unsecured creditors as Class 11. Paragraph 4 of the Plan describes Class 1 as "[t]he allowed secured claims of CVM . . . in the total amount of $732,012.75, based on filed secured proofs of claim, secured by first priority blanket security interest in the Debtor's livestock and livestock proceeds, equipment and milk equity, transferred to Galilee . . . ." (*Id.*) Paragraph 6 of the Plan purports to deem CVM's Class 1 claim "secured to the extent of $545,134, based on appraised values, and deducting prior liens." (*Id.*) Thus, Debtor seeks to bifurcate CVM's claim, to discount the rate of interest on the secured portion of the claim to 5.25% per annum, and to treat the unsecured balance as a Class 11 general unsecured claim. Paragraph 12 of the Plan lists its source of funding as Galilee's income consisting of milk sale

---

[10] *See supra* note 4.

proceeds, government payments, cull cow proceeds, income tax refunds, custom work, and crop sale proceeds.  (*Id.*)

As referenced herein,[11] on December 17, 2009, CVM commenced an adversary proceeding against Debtor and Galilee by filing a complaint asserting three causes of action seeking to (1) determine the nature, extent, and priority of its alleged lien pursuant to Fed. R. Bank. P. 7001(2); (2) declare certain debts nondischargeable pursuant to Code § 523(a)(2); and (3) declare certain debts nondischargeable pursuant to Code § 523(a)(6).  (Adv. Pro. ECF No. 1, CVM's Ex. 34.)[12]  CVM alleges, *inter alia*, that Debtor transferred assets without its knowledge or permission in violation of the parties' security agreements, Debtor converted property by failing to pay the proceeds of such sale over to CVM, and Debtor diverted the proceeds of a milk check to Galilee.  Debtor filed an Answer on January 18, 2010 (Adv. Pro. ECF No. 4, CVM's Ex. 39), and denied all allegations of wrongdoing therein, but he specifically admitted, *inter alia*, that on or about January 1, 2008, he transferred some or all of his assets to Galilee, certain milk proceeds were made payable to Galilee, Galilee transferred livestock for sale, and proceeds from the sale are being held in escrow.  Galilee separately filed an Answer on January 20, 2010. (Adv. Pro. ECF No. 5.)  Debtor and Galilee asserted in their respective Answers numerous affirmative defenses, including that they sought and obtained CVM's consent to the CWT bid, which was never conditioned upon all proceeds being made payable to CVM.  Pursuant to the Court's issuance of an Amended Scheduling Order in the adversary proceeding, the trial is scheduled for November 8, 2010.  (Adv. Pro. ECF No. 10.)

## ARGUMENTS

---

[11] *See supra* note 10.

[12] *CVM Partners 1, LLC v. Nichols (In re Nichols)*, has been assigned Adversary Proceeding Number 09-80079, and all further references herein to adversary proceeding documents relate to the same.

According to CVM, Debtor's fraudulent acts committed in connection with his Chapter 12 case include his: (1) formation of Galilee as a vehicle to shield assets from the reach of creditors; (2) pre-petition conveyance of equipment, livestock, and other farm assets to Galilee, for inadequate consideration and in violation of the parties' security agreements and without CVM's consent—a transfer that CVM now contends never occurred, or, if the Court should find that the transfer did occur, would be fraudulent and therefore avoidable; (3) intended transfer of a membership interest in Galilee without fair consideration or reasonably equivalent value to his son, Scot; and (4) pre-petition sale or disposition of at least $324,000 in cows, which were subject to CVM's security interest, without remitting the proceeds to CVM.

CVM asserts that Debtor set up Galilee with the specific intent of shielding assets from the reach of his creditors because, under New York law, Debtor's judgment creditors are entitled only to a charging lien on distributions arising from an individual's membership interest in a limited liability company.[13]  Thus, CVM avers that Debtor knew that, by virtue of properly executed pre-petition planning and acts, CVM would only have been able to reach Debtor's distributions, and not the assets acquired by Galilee by the pre-petition transfers, in order to satisfy its debt.  Armed with this knowledge, CVM contends that Debtor then promulgated false statements and schedules, together with the Plan, all of which are based upon the fraudulently conceived but never completed transfer of assets from Debtor to Galilee.  By transferring assets to Galilee—or attesting that such transfer had occurred when it had not—and nonetheless attempting to strip or otherwise modify the liens of secured creditors through his Chapter 12 Plan, CVM avers that Debtor is attempting to game the system, his creditors, and this Court.

---

[13] CVM's legal conclusion regarding this point of law is disputed by Debtor, but beyond the scope of the Court's discussion given the Court's ultimate ruling herein.

In addition to CVM's assertions regarding Debtor's ill motives for forming and setting up Galilee to hold farm assets, CVM cites other badges of fraud that it contends support the serious relief requested.  They include, but are not limited to, the alleged mischaracterization of the nature of the obligations owed to CVM as non-recourse on his SOFA in order to mislead the Court and creditors to believe that he could strip the liens of a non-debtor, Galilee, and thereby allow him to retain the proceeds that rightly belong not to Debtor, but to CVM.

The arguments made by NAEDA and FNEF largely mirror those of CVM.  NAEDA and FNEF assert that there is "manifest abuse" in this case, as evidenced by the following: (1) Galilee is not a co-debtor as to the vast majority of creditors, (2) Galilee possesses all of the Debtor's assets and apparently controls his income and business operations, (3) Galilee operates outside the control of this Court and the Trustee, (4) Debtor is operating outside the purview of the Court through a "sham business entity" to the detriment of his creditors, and (5) Debtor could have but chose not to file Galilee and consolidate or jointly administer the cases.  Accordingly, they too conclude that Galilee is designed to keep Debtor's assets outside the control and reach of the Court, trustee, and creditors.

Debtor, first and foremost, contends that Galilee was legitimately formed as a means of succession planning at a time when he was current in substantially all of his business and personal obligations, including his debt then owed to HSBC.  Debtor further steadfastly asserts that he held a good faith belief that his assets had been transferred to Galilee in exchange for Galilee's agreement to assume the underlying indebtedness associated with the same.  Debtor submits that he fully disclosed all transactions that occurred more than one year prior to filing and prior to assignment of this debt by HSBC to CVM, including the transfer of certain items of CVM collateral to Galilee.  Moreover, Debtor states that the transactions at issue did not

diminish the collateral or place these assets beyond the reach of CVM.  Debtor argues that he has

at all times and continues now to acknowledge that these assets continue to be collateral for the

obligations owed to CVM.  He further represents that at all times, both pre- and post-bankruptcy,

he has cooperated with both creditors and the Chapter 12 trustee.  Debtor argues that, although

he would agree to reverse the transfer of assets to Galilee to once again hold the assets in his

personal name if necessary to effectuate his Plan, and that the record does not contain evidence

of actual fraud committed by Debtor in connection with his case.  Rather, he has listed all assets

and Debtor suggests that CVM's motion is simply an attempt to sabotage confirmation of his

Plan.

## DISCUSSION

In this Court's view, the extraordinary nature of the relief afforded by Code § 1208(d) is

more fully appreciated when viewed against the historical backdrop of Chapter 12.  Accordingly,

the Court begins its analysis of Code § 1208(d) with a brief overview of the history of the

Chapter in which this section resides.

"Farmers have long enjoyed favored status in America's bankruptcy laws."  Katherine M.

Porter, *Phantom Farmers: Chapter 12 of the Bankruptcy Code*, 79 Am. Bankr. L.J. 729, 730

(2005) (discussing the history of Chapter 12 and advocating for the development of broadly

applicable economic initiatives to assist rural families).  Specialized bankruptcy relief for family

farmers has existed for two decades.  Chapter 12 was first enacted on a temporary basis as part of

the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, and

a series of extensions followed to keep Chapter 12 alive.  *Id.* at 731–32 nn.14 & 15.  Chapter 12

is rehabilitative in nature and was initially designed as a more workable vehicle to overcome

perceived problems with farmers' potential reorganization under either Chapter 11 or Chapter

13.  *Id.* at 732 n.19 (citation omitted); *see also* Ralph A. Peeples, *Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule*, 63 Am. Bankr. L.J. 65, 103 (1989) (citing congressional history).  The aim of Congress was to give family farmers a "fighting chance" to keep their land and to return to full-time farming after reorganizing.  Porter, 79 Am. Bankr. L.J. at 734; *Harmon v. United States ex rel. FMHA*, 101 F.3d 574, 584 (8th Cir. 1996) (quoting H.R. Conf. Rep. No. 99-958, at 48 (1986), *reprinted* in 1986 U.S.C.C.A.N. at 5251–52).  With the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective on October 17, 2005, Chapter 12 became a permanent part of the Code.  Through BAPCPA, Congress changed Chapter 12 to again improve the ability of family farmers to successfully reorganize.  Porter, 79 Am. Bankr. L. J. at 733.

In the spirit of assisting rural families, which is the ultimate and singular goal of Chapter 12, Congress gave creditors far less control in a Chapter 12 case than they would have in a Chapter 11 case.  *Id.*  "Compared to Chapter 11, a creditor in a Chapter 12 case has relatively few tools at its disposal to derail a debtor's efforts to reorganize."  *Id.* at 743.  One such tool, however, unique to Chapter 12, is Code § 1208(d).[14]  *See In re Caldwell*, 101 B.R. 728, 740 (Bankr. D. Utah 1989) (characterizing this section as a "very unusual provision").  Although Congress sought to ease the burdens of family farmers who found bankruptcy to be their only option, it "'also intended to prevent abuse of the bankruptcy system and to ensure farm creditors [would] receive fair debt repayment treatment.'"  *In re Pianowski*, 92 B.R. 225, 232 (Bankr. W.D. Mich. 1988) (quoting H.R. Conf. Rep. No. 99-958, 99th Cong., 2d Sess. 48 (1986)).  Once triggered, Code § 1208 ensures that a Chapter 12 debtor's conduct in connection with his or her

---

[14] By comparison, Chapter 11 and Chapter 13 cases in which the debtor is a family farmer may not be converted to Chapter 7 over the debtor's objection.  *See* 11 U.S.C. §§ 1112(c) and 1307(c) (2006), respectively.

case at all times comports with the universally applied threshold requirement that he or she deal honestly and openly with the Court and all creditors.

The Code provides,

> On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has *committed fraud in connection with the case*.

11 U.S.C. § 1208(d) (2006) (emphasis supplied). "Section 1208(d) contains the most potent sanction a bankruptcy court may impose on a family farmer—the conversion of his case to a liquidation under [C]hapter 7." *In re Bair*, 2002 Bankr. LEXIS 1895, at *17 (Bankr. D. Ka. Feb. 1, 2002). Because this remedy is so extreme, it "will be very rarely enforced." *In re Bair*, 2002 Bankr. LEXIS 1895, at *22. "Only the very few debtors who refuse to cooperate, are not forthcoming, and who evidence not only bad faith, but dishonest conduct, will be denied the opportunity to reorganize under [C]hapter 12." *Id.* Given the severity of the relief sought, the movant carries a heightened burden of proof and must establish the debtor's commission of fraud by clear and convincing evidence. *In re Hoffman*, Chapter 12 Case No. 99-61365, slip. op. at 6 (Bankr. N.D.N.Y. July 9, 1999) (citing *In re Caldwell*, 101 B.R. 728, 732 (Bankr. D. Utah 1989)). As the movant in this case, CVM bears the heavy burden of proving that Debtor acted with fraudulent intent, because "it is never enough to prove merely that a debtor took actions [that] happened to prejudice a creditor." *In re Hoffman*, Chapter 12 Case No. 99-61365, slip op. at 6 (citing *In re Graven*, 936 F.2d 378, 378 (8th Cir. 1991)). "Because direct proof of fraudulent intent is often difficult to obtain, however, a creditor may carry his burden by proving circumstantial 'badges of fraud' [that] are indicative of a debtor's intent." *Id.* (citing *In re Carletta*, 189 B.R. 258, 262 (Bankr. N.D.N.Y. 1995).

The Court's determination under Code § 1208(d) is a factual one.  *See, e.g., In re Graven*, 936 F.2d at 382 (citing cases).   While the legislative history of Code § 1208 is sparse and provides little help in interpreting what type of conduct Congress believed merited this exception in Chapter 12 cases to the prohibition against involuntary conversion, which is unique to Chapter 12, courts have established stringent standards for determining when such relief is warranted. *See, e.g., In re Hoffman*, slip op. at 8 (for nearly two years, while under the auspices of three prior bankruptcies and with the continued protection of the automatic stay, the debtor "carried out a deliberate, systematic conversion of [the secured creditor's] collateral and abused the bankruptcy process"); *In re Kloubec*, 268 B.R. 173, 176 (N.D. Iowa 2001) (citing *In re Kloubec*, 247 B.R. 246, 258 (Bankr. N.D. Iowa 2000) (noting evidence of "'a concerted pattern of conduct designed to misrepresent the [debtors'] financial picture'")); *In re Bange*, 2010 Bankr. LEXIS 1225, at *11 (Bankr. D. Kan. Apr. 5, 2010) (applying the definition of actual fraud and finding "damage to the bankruptcy process" sufficient to justify conversion); *In re Williamson*, 414 B.R. 886, 892 (Bankr. S.D. Ga. 2008) (text-book case for conversion under Code § 1208(d) involves concealment, false statements, and omissions that collectively evidence an intent to manipulate the bankruptcy process); *In re Zurface*, 95 B.R. 527, 538 (Bankr. S.D. Ohio 1989) (finding an overall fraudulent scheme to defraud creditors).   *See also* 8-208 COLLIER ON BANKRUPTCY ¶ 1208.04 (MB 2010) ("This Section refers to fraud generally, including, for example, intentional concealment of assets and intentional misrepresentations to the court.").

Because Code § 1208(d) is infrequently invoked, the Court's inquiry under this section must be painstakingly made on a case by case basis.  Although no two fraud cases will ever be precisely alike, common indicia of fraud may be gleaned from the patterns of those cases in which debtors were found to have committed "fraud in connection with the case."  Therefore, a

careful examination of the facts in the relatively few cases where the court has granted a party's request for dismissal or conversion is warranted. The Court undertakes this examination while keeping in mind that the Debtor's alleged transgressions in the case *sub judice*, with the exception of the sale of livestock, all stem from the formation of and the alleged pre-petition transfer of assets to Galilee. CVM summarily contends that Debtor's actions with respect to Galilee in turn precipitated the inclusion of inaccurate or fraudulently made statements in Debtor's tax returns, financial statements, petition, and schedules. In determining whether this Debtor's conduct rises to the level of "fraud committed in connection with the case," his conduct must be compared with that of other debtors, whose pre- and post-filing conduct has also been carefully scrutinized under Code § 1208(d).

In *Hoffman*, a decision issued by Retired Chief Judge Gerling over a decade ago, the debtor unsuccessfully filed for Chapter 13 relief twice prior to filing for Chapter 12 relief. The debtor's first bankruptcy case was dismissed upon motion of the Chapter 13 trustee for the debtor's failure to make plan payments and his second bankruptcy case was dismissed upon motion of the secured creditor, First Pioneer Farm Credit, A.C.A. ("First Pioneer"), pursuant to Code § 1307(c). The debtor filed his third case under Chapter 12 shortly after First Pioneer repossessed certain of his personal property pursuant to a state court order.

There, First Pioneer held a first mortgage on the debtor's home and possessed a perfected security interest in the debtor's herd of two hundred cattle, as well as all proceeds of the sale of livestock. *Id.* at 3. The debtor pledged not to "sell, lease, transfer, assign, or otherwise dispose of" any of the livestock without the prior written consent of First Pioneer. *Id.* In 1996, the debtor represented to First Pioneer that he owned free and clear of all liens two hundred cattle. By the summer of 1997, that number declined to one hundred and forty-one cows. Less than

five months later, a farm inspection by an employee of First Pioneer revealed that the debtor owned only ninety cows. By the spring of 1999, when First Pioneer attempted to repossess its collateral, the debtor represented that he owned only sixteen cows, and that he had inflated the number on his bankruptcy schedules by including cows that were in his possession but owned by his grandfather. *Id.* at 3–4. In addition, the debtor failed to list as an asset in his Chapter 12 case his interest in the proceeds of minerals extracted from a gravel and sand mine on his property, for which he was paid approximately $30,000 to $40,000 per year. *Id*. at 5.

Judge Gerling found through testimony offered by the debtor at an evidentiary hearing on various contested matters, including First Pioneer's Code § 1208(d) motion, that the debtor failed to (1) notify First Pioneer of his decision to cull the herd, or to pay First Pioneer any of the culling proceeds, (2) file an insurance claim for cows killed or injured in a barn accident or to notify First Pioneer of the accident, (3) notify First Pioneer of the sale of one cow to a pet food company following an accident whereby the cow was injured, (4) take any steps to recover cows that wandered onto a neighbor's property and were thereafter converted by such neighbor, and (5) obtain a fair price for the sale of twenty cows without First Pioneer's knowledge or consent, but which proceeds were turned over to First Pioneer. The court specifically found that "the degree to which the size of the herd was reduced, as well as the [short] length of time over which it occurred, [made] the inference of deliberate fraud in this case inescapable." *Id.* at 7. The court was skeptical of the debtor's explanation that the misfortunes of the herd were borne entirely by those cows owned by the debtor, rather than the ones owned by his grandfather, who not only survived multiple accidents but rather doubled in number as the debtor's share of the herd decreased to a fraction of its former size. *Id.*

In addition, Judge Gerling found that the debtor redirected mining proceeds to a third-party right around the time the debtor filed his first bankruptcy petition, yet the party who had contracted with the debtor to pay the mining proceeds testified that although he was instructed to pay the proceeds to a third-party, he believed the monies would eventually be used for the debtor's benefit.  Given the debtor's lack of credibility and "sizeable gaps in his testimony," together with the aforementioned findings of fact, Judge Gerling concluded that the debtor had engaged in the "deliberate, systemic conversion" of assets and that he had a history of abusing the bankruptcy process. *Id.* at 7–8.  Accordingly, Judge Gerling determined that dismissal of the debtor's case was proper and, perhaps even more telling of how egregious this debtor's behavior was, also barred the debtor from filing another bankruptcy petition under any Chapter of the Code for one hundred and eighty days. *Id.* at 8–9.

In *Kloubec*, the court determined that the debtors engaged in a systemic scheme to misrepresent their financial picture with the intent to improve their financial position at the expense of their unsecured creditors. *In re Kloubec*, 247 B.R. 246, 259 (Bankr. N.D. Iowa 2000), *aff'd*, 268 B.R. 173 (N.D. Iowa 2001).  The debtors individually and jointly committed bad acts, and in particular, Mr. Kloubec disclaimed a significant inheritance in order to channel at least $85,000 from the creditors of the bankruptcy estate into the hands of the debtors' children.  Jointly, debtors' fraudulent acts included, but were not limited to (1) failing to list a number of substantial assets estimated to be worth approximately $25,000 to $50,000; (2) transferring ownership of a non-exempt vehicle post-petition but listing in their schedules that the transaction had occurred pre-petition; (3) attempting to camouflage the equity in their farm; (4) allowing family members to take liens on, and security interests in, certain assets; and (5) failing to timely open a debtor-in-possession account in violation of Code § 364. *Id.* at 256-58.

Accordingly, the court found that almost every indicia of fraud was met in the case. *Id.* at 258. The court reasoned that '[w]hile conversion to a Chapter 7 liquidation is a harsh result, it is specifically for conduct of this type that § 1208 was designed." *Id.* at 258. Recognizing that the debtors failed to exhibit any concern for the rights of their creditors, but were instead "solely concerned for themselves and for utilizing the system for their own benefit," the court granted the United States trustee's motion to convert the case to Chapter 7. *Id.* at 259.

In *Bange*, the court found that the debtor committed actual fraud by intentionally delaying payment to his creditors for nearly two years after filing for relief, without ever having possessed an intent to reorganize or to comply with any plan to actually pay them. *In re Bange*, 2010 Bankr. LEXIS 1225, at *10. Specifically, the debtor spent a year and a half purportedly resolving disputes with various creditors. During that time and after he obtained permission to incur post-petition secured debt to help him operate his farming business, he sent the Chapter 12 trustee a number of counterfeit money orders and directed the trustee to pay his debts with them without his attorney's knowledge. *Id.* at *2. Upon learning that his illegal activities had failed, the debtor then filed his Chapter 12 plan of reorganization. At the confirmation hearing, however, the debtor testified under oath that he was not comfortable with the plan because he believed his creditors should be required to produce additional evidence of the debts. *Id.* at *3. Although his attorney was satisfied that the secured creditors had properly proven the debts owed to them, the debtor indicated that the creditors had loaned him only "credit," not money, and that he therefore was not required to repay them. *Id.* at *4. Thereafter, the debtor again without the knowledge of his attorney, filed various papers seeking to have the Chapter 12 trustee removed. Eventually, the debtor's counsel sought to withdraw as attorney of record, which motion the court granted. Based on the inability of the court, the trustee, and the debtor's creditors to rely

on his good faith in achieving confirmation of a plan, the court found damage to the bankruptcy process sufficient to grant the trustee's motion to convert the debtor's case to Chapter 7 and liquidate the estate for the benefit of creditors.

The court in *Williamson* described the case before it as the "text-book case for conversion under [Code] § 1208(d)," since the record was replete with instances of concealment, false statements, and omissions by the debtor that collectively evidenced an intent to manipulate the bankruptcy process. *In re Williamson*, 414 B.R. at 892. Specifically, the court found that the debtor failed to disclose, either at the time of filing or through subsequent amendments to his schedules, the existence of J & K Farms, an entity that he controlled as a solely owned proprietorship, and at least four bank accounts that were open on the date of filing in the name of J & K Farms. *Id.* at 888, 892. In addition, the debtor filed false monthly operating reports concealing large bank balances in the hidden accounts, concealed numerous large FSA deposits to his accounts, and made cash withdrawals of large sums of money from one of the undisclosed accounts, which apparently constituted the proceeds of a crop disaster insurance claim which the debtor also failed to reveal in his schedules, hid in a corn bin and later claimed was stolen. *Id.* at 892. The court described the debtor's conduct as "indefensible under any standard of conduct for debtors under bankruptcy protection," and which amounted to fraud on the court and his creditors. *Id.*

In *Bair*, the court specifically cited five bad acts committed by the debtor that solidified its finding of fraud. First, the debtor failed to list numerous assets in his schedules, including the correct number of cattle that he owned at the time of filing, and he misrepresented his income and that of his wife. *In re Bair*, 2002 Bankr. LEXIS 1985, at *20. Second, the debtor destroyed and stole personal property belonging to and located at the farm that he and his family leased, all

of which were subject to a bank's liens, and all of which belonged to a corporation in which he held a 50% ownership. *Id.* Under the terms of the debtor's lease agreement with the corporation, he was not to make modifications to the property or environs without the corporation's permission. *Id.* at *3. Third, he forged a note purportedly from his landlord in order to secure cash. *Id.* Fourth, he failed to allow the bank to make post-petition inspections of the farm property, and he sold cattle post-petition and used the proceeds without the bank's consent, notwithstanding that the bank held both a mortgage and security interest in the same. *Id.* at *21. Fifth, the debtor intentionally misrepresented to the court that he had not conducted any business since filing for bankruptcy protection, although he later testified otherwise. *Id.* Rather than amend his schedules to accurately report his business affairs, file a plan in a timely manner, or accurately report the whereabouts of certain assets, the debtor spent his time disassembling the farm and moving its pieces to a new homestead which was protected by his wife's Chapter 13 filing. *Id.* at *21–22. The court found the debtor's character and credibility to be entirely lacking, so much so that "neither the written record nor [the court's] descriptive powers [could] adequately portray this debtor's demeanor while testifying." *Id.* at *17. The court found that the debtor's tone of voice, body language, and choice of words while on the witness stand "exuded rudeness, contempt and defiance." *Id.*

The debtors in *Hoffman, Kloubec*, *Bange*, *Williamson*, and *Bair*, whose collective bad acts included, but were not limited to, patterned deceit, illegal conduct, failure to list significant assets, concealment, and/or perjury, were reprehensible. They committed illegal acts, lied, disclaimed assets, hid and purposely failed to disclose assets, schemed to improperly divert assets to unrelated third parties and/or family members, destroyed assets, and abused the bankruptcy process for the sole purpose of holding creditors at bay.

By comparison to these debtors, at least one of whom attempted to completely shield from view the limited liability company that he fully controlled, the facts in this case show a debtor whose (1) bankruptcy filing was done as a last resort, (2) loan documents, financial statements, and petition list all assets either owned by him or that are in his possession, including those that may or may not have been transferred to Galilee, (3) testimony regarding his motives was credible, and (4) efforts are aimed at confirmation of a viable plan.

The Court finds Debtor in this case to be an honest and hard-working seventy-two year old farmer struggling to preserve his way of life and that of his family. Unfortunately, he was unable to weather and survive the recent dairy farm crisis triggered by a historic drop in milk prices and sought relief under Chapter 12 of the Code. Unlike many of the aforementioned debtors, whose credibility was lacking, nothing in Debtor's demeanor or the substance of his testimony, as buttressed by the testimony of Ms. Moulton, gives the Court reason to discredit Debtor's intent or reasons for either forming Galilee or for seeking relief under Chapter 12. Case law clearly establishes that only the most severe transgressions can support an involuntary conversion of a family farmer's case under Code § 1208(d). Here, CVM has failed to carry its burden of proof.

The Court begins with Debtor's formation of Galilee and its impact on Debtor's future financial statements and petition. Debtor is an educated farmer and businessman with considerable years of experience in the dairy farming industry and is sophisticated enough to know that he needed the assistance of the trusted professionals he has worked with for nearly a decade, to ensure the next generation continues with the family farm that has been in business for nearly two hundred years. He discussed succession planning with his trusted professionals, although not in detail at times, at least repeatedly on an annual basis. While perhaps misplaced,

it is clear from Debtor's testimony that he possessed an almost blind faith and absolute trust in both his corporate attorney and his accountant to accomplish his estate planning objectives. Debtor's perception of both his and Galilee's state of affairs was clearly influenced by the advice that he received from these professionals over the past decade. The Court is convinced that it was this degree of blind faith that led Debtor to execute conflicting or inconsistent financial statements and tax returns pre-petition,[15] rather than the requisite fraudulent intent in connection with the filing of this Chapter 12 case that would necessarily prevent him from having the opportunity to reorganize. Given the complicated financing arrangements that farmers typically face, and the advice or guidance rendered by Debtor's accountant, and quite possibly by his corporate counsel, it is understandable that Debtor's perception of his affairs may have differed from reality. Further, although Debtor is a seasoned farmer, it is understandable that he may not have fully appreciated the ramifications of his business decisions as to his creditors.

In the Court's view, blind faith does not automatically equate to bad faith, or, without more, allow for the inference of fraudulent intent to be drawn in the case *sub judice*. In fact, a debtor's reasonable reliance on the advice of an attorney may serve to negate any inference of fraudulent intent. *In re Kloubec*, 268 B.R. at 177 (citing *In re Ellingson*, 63 B.R. 271, 277 (Bankr. N.D. Iowa 1986)). In this case, even if the Court were to have found that Debtor or Galilee's financial statements and/or tax returns raised an inference of fraud, such inference would have been negated by Debtor's reliance on actions taken by the professionals, which the Court finds was actual, reasonable, and justifiable.

The Court next examines Debtor's actions and dealings with his creditors, including HSBC and CVM. The Court simply does not find support in the record for CVM's assertion,

---

[15] Per Ms. Moulton's testimony, and as previously noted, the tax returns were subsequently corrected in later years.

which both FNEF and NAEDA support, that Debtor formed Galilee and subsequently transferred assets to Galilee allegedly to effectively shield those assets from the reach of creditors.[16]  Debtor had a long-term relationship with CVM's predecessor, HSBC, having secured various loans from both entities for farming purposes during the past several years.  He honored his obligations on those loans until the dairy crisis made it impossible to do so.  Further, although HSBC had or should have had knowledge of Galilee as early as December 31, 2008, due to Debtor's inclusion of Galilee as a joint party to the December 2008 FFS, Galilee and the transactions associated with Galilee apparently did not become suspect until Debtor defaulted on his obligations owed to CVM.  This therefore supports Debtor's testimony that he conducted himself in good faith with respect to his obligations to his creditors and, more specifically, to CVM until February 2009, when it became financially impossible for Debtor to continue to timely satisfy his obligations due to circumstances out of his control.

Further, his testimony established that he did understand that various security agreements collateralized obligations owed to CVM, as evidenced by certain promissory notes and loan agreements.  His testimony, which this Court found to be credible, further established, however,

---

[16] The Court does not consider either Debtor or Ms. Moulton's testimony to be dispositive on the question of fact whether an asset transfer was effectuated from Debtor to Galilee.  Because the Court has an incomplete record before it, and the individual most competent to speak to the transactions that occurred between Debtor and Galilee, namely Attorney Collins, who is counsel of record to Galilee in the adversary proceeding, has yet to be heard on this issue, this question is best left for another day.  Further, the Court need not determine the issue for purposes of its Code § 1208(d) ruling, because even if the Court were to find that assets had been transferred from Debtor to Galilee, the Court's ruling on the question of fraud in connection with the case would remain unchanged.  Nevertheless, NAEDA and FNEF have raised valid questions in the context of confirmation regarding Debtor's eligibility to be a Chapter 12 debtor.  Ownership of the farm assets and responsibility for the underlying debts associated therewith must be conclusively determined before this case can proceed.  Debtor will need to show that he is eligible to be a Chapter 12 debtor.  *See* 11 U.S.C. §§ 101(18) and 109(f).

that he reasonably believed CVM's rights were unimpaired by the alleged transfer of assets to Galilee.

Unlike the debtors in the previously addressed cases, Debtor in this case did not intentionally conceal assets or transfers.  Rather, Debtor identified Galilee on financial statements submitted to HSBC immediately after Galilee was formed and more than one year prior to his default on obligations owed to HSBC or CVM.  Debtor also listed all assets believed to be under his or Galilee's ownership in his petition once he filed for bankruptcy relief.  For example, he lists every asset in the addendum attached to the SOFA and the schedules reflect Debtor's understanding that CVM retains a lien on said assets.

Taken together, the facts and circumstances presented in this case weigh heavily in Debtor's favor.  Unless otherwise proven through CVM's adversary proceeding, it appears that Debtor is precisely the type of individual family farmer Congress sought to assist through the enactment of Chapter 12.

## CONCLUSION

For the reasons stated herein, the Court finds that Debtor did not have the requisite fraudulent intent and the evidence simply does not support a finding of fraud in connection with his Chapter 12 case.  Accordingly, CVM's motion under Code § 1208(d) is hereby denied.

At the conclusion of the evidentiary hearing on April 27, 2010, the Court advised the parties that, if appropriate, it would return confirmation matters to Court's next regularly scheduled confirmation calendar.  However, CVM's pending adversary proceeding wherein CVM seeks, in part, to determine the nature, extent, and priority of its lien pursuant to Fed. R. Bankr. P. 7001(2), as well as ownership of all farm assets, must be addressed before Debtor can

proceed with confirmation.  The Court will therefore conduct status conferences in both CVM's

adversary proceeding and Debtor's main case as ordered herein.

Based on the foregoing, it is hereby

ORDERED, that CVM's motion to dismiss or, in the alternative, convert Debtor's

Chapter 12 case to one under Chapter 7 of the Code pursuant to Code § 1208(d) is hereby

denied; and it is further

ORDERED, that Debtor and all interested parties to Debtor's Chapter 12 case shall

appear for a status conference to be held in this matter on September 21, 2010, at 11:30 a.m. in

Utica, New York; and it is further

ORDERED, that the parties to CVM's adversary proceeding shall appear for a status

conference to be held in this matter on September 21, 2010, at 11:30 a.m. in Utica, New York.

IT IS SO ORDERED.

Dated at Utica, New York
this 31st day of August, 2010

/s/ Diane Davis_____
DIANE DAVIS
United States Bankruptcy Judge